UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

ABIGAIL ROTHSCHILD KAPLAN,

                      Plaintiff,

          v.

COUNTY OF NASSAU, POLICE OFFICER
THOMAS CURTAIN, in his official and individual
capacity, POLICE OFFICER TIMOTHY DILENA,
in his official and individual capacity, and POLICE
OFFICER JOSEPH LOBELLO, in his official and
individual capacity,

                      Defendants.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
11-CV-3853 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Abby[1] Rothschild Kaplan commenced the above-captioned action against

Defendants County of Nassau, the Nassau County Police Department, and John Doe Police

Officers #1–10 on August 9, 2011, alleging violations of her Fourth, Fifth, Sixth and Fourteenth

Amendment rights pursuant to 42 U.S.C. § 1983.  (Compl. ¶ 1.)  On December 6, 2011, Plaintiff

filed an Amended Complaint naming Police Officer Kiznicki as a Defendant, and on March 4,

2013, Plaintiff filed a Second Amended Complaint withdrawing her allegations against Kiznicki

and naming Police Officer Thomas Curtain, Police Officer Timothy DiLena, and Police Officer

Joseph Lobello as Defendants.  (Docket Entry Nos. 4, 24.)  At a pre-trial conference on August

8, 2014, the Court dismissed the Nassau County Police Department from the action.

---

[1]  Though named as "Abigail" in her initial Complaint, and thus in the caption of this
action, Plaintiff's first name is "Abby."  (*See* Trial Tr. ("Tr.") 825:9–12.)

On November 3, 2014, the Court commenced a jury trial on Plaintiff's claims of excessive force, unlawful seizure and false imprisonment, abuse of process, conspiracy, assault and battery. At the conclusion of Plaintiff's case, Defendants moved for judgment as a matter of law as to all claims against all Defendants. (Minute Entry and Order dated Nov. 6, 2014.) The Court granted Defendants' motion as to the excessive force claim against police officer Joseph Lobello, and denied Defendants' motion in all other respects. (Minute Entries and Orders dated Nov. 6, 2014 and Nov. 7, 2014.) Defendants presented their case, and Plaintiff did not present a rebuttal case.[2] At the conclusion of the six-day trial, the Court submitted the evidence to the jury for consideration, and the jury returned a verdict in favor of Defendants on all counts. (Docket Entry No. 64.) Plaintiff now moves for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure, arguing that the verdict was seriously erroneous and against the weight of the evidence, and that permitting the verdict to stand would result in a miscarriage of justice. For the reasons set forth below, Plaintiff's motion is denied.

## I.    Background

The Court recounts the evidence presented at trial in some detail, as Plaintiff argues that the jury's verdict is against the weight of the evidence. *See Raedle v. Credit Agricole Indoseuz*, 670 F.3d 411, 413 (2d Cir. 2012).

On the evening of August 9, 2010, Nassau County Police Department officers Curtain, DiLena and Lobello (collectively, the "Officers") responded to Plaintiff's residence after being directed to the location by their dispatcher. The Officers encountered Plaintiff, her then-husband (now ex-husband) David Kaplan, and her friend and neighbor Steven Jacobs. Plaintiff was ultimately arrested and transported to Nassau University Medical Center ("NUMC") over her

---

[2] Plaintiff did not move for judgment as a matter of law.

objection.  The Officers report, filed after the incident, stated that there was a domestic violence incident and that Plaintiff had threatened to kill herself, necessitating involuntary medical transport.

Plaintiff's brother Mark Kirshner, Jacobs, Kaplan, Plaintiff, the Officers Curtain, DiLena and Lobello, as well as Regis Beneville — the medical technician who responded with an ambulance — all testified as to the events on the night in question.  Plaintiff's witnesses and Defendants had strikingly divergent recollections of what happened between the time the Officers first responded to Plaintiff's residence and the time Plaintiff was brought to NUMC. That testimony, as well as documentary evidence introduced throughout the trial, is briefly summarized below.[3]

---

[3]  At trial, the jury also heard substantial testimony regarding Plaintiff's medical conditions.  Plaintiff's treating psychologist, Dr. Edmond Neuhaus, and her treating internist, Dr. Perry Wyner, and Defendant's expert witnesses Dr. Jerrold Gorski and Dr. Michael Melamed, each testified as to the effects of the August 9, 2010 incident on Plaintiff's health.  Dr. Neuhaus testified that Plaintiff, in her 77 visits with him, reported pervasive fear, flashbacks and hypervigilance, and that he diagnosed her with post-traumatic stress disorder.  (Tr. 591:20–593:14, 594:14–17.)  Based on what Plaintiff had told him in their sessions, Dr. Neuhaus believed the disorder originated as a result of the August 9, 2010 incident.  (Tr. 593:11–14, 599:4–600:12.)  Dr. Wyner testified as to Plaintiff's multiple sclerosis treatment and other treatment both before and after the August incident.  (Tr. 621:24–626:4; *see, e.g.*, Tr. 629:8–25.) Dr. Gorski is an orthopedic surgeon, (Tr. 213:2–14), and opined that while it was clear "something happened" and Plaintiff may have sustained some sprains, bruising and bumps on the evening of August 9, 2010, her injuries healed in a matter of weeks and had no lasting effects, (Tr. 221:18–222:3, 243:6–244:2).  Dr. Gorski agreed that some of Plaintiffs longstanding issues, such as those with her neck and back, could have been aggravated on August 9, 2010.  (Tr. 235:16–22.)  Dr. Melamed is a psychiatrist, (Tr. 751:10–22), who examined Plaintiff in 2013, at Defendants' request, (Tr. 753:19–754:11).  Dr. Melamed found Plaintiff unusually talkative, (Tr. 759:12–17), and concluded that the diagnosis of post-traumatic stress disorder was "grossly exaggerated," and that Plaintiff did not sustain an enduring psychiatric or psychological disorder as a result of the incident.  (Tr. 762:1–4, 763:10–18).

### a. Evidence regarding the events of August 9, 2010

#### i. Plaintiff's version of events

At approximately 7:30 PM the evening of August 9, 2010, Jacobs came over to the home Plaintiff shared with Kaplan to cook them dinner. (Tr. 85:23–87:12, 155:20–22.) Kaplan, though present in the home, chose not to eat dinner with Plaintiff and Jacobs and instead ate pizza while watching television. (Tr. 156:3–9, 294:2–21.) Plaintiff ate in her bedroom. (Tr. 492:1–2.) After dinner, Kaplan remained in the living room watching wrestling on television, Plaintiff stayed in her bedroom, where she had eaten, to watch the television in that room; and Jacobs visited with each of them in the separate rooms. (Tr. 87:21–88:14.) Eventually, Jacobs, fully clothed, fell asleep on Plaintiff's bed, while she sat in the bed on the opposite side.[4] (Tr. 88:22–89:3, 107:25–108:9, 295:11–18, 493:19–494:1.) When Kaplan's television show ended at approximately 11:00 PM, he walked into the bedroom and loudly told Jacobs to leave. (Tr. 89:11–17, 294:20–295:24.) Plaintiff requested that Jacobs stay while she made two telephone calls and he obliged. (Tr. 89:14–17, 110:4–10.)

Plaintiff called her brother, Mark Kirshner. (Tr. 45:13–46:14.) Kirshner heard noise in the background and became concerned that Kaplan sounded agitated, as Kaplan had a history of emotional and mental health issues and occasionally needed to have his medication adjusted. (Tr. 46:15–48:2.) Plaintiff informed Kirshner that Kaplan was not taking his medication. (Tr. 495:3–10.) Kirshner tried to persuade her to leave or call for help herself, but she left the decision to call for help to Kirshner. (Tr. 48:3–23, 495:13–496:10.)

Thereafter, Kirshner called the police. He explained his belief that Kaplan needed to be

---

[4] Plaintiff and Jacobs testified that it was commonplace for Plaintiff to entertain guests in her bedroom, and that he and Plaintiff never had a sexual relationship. (Tr. 108:10–109:18, 470:10–16, 484:2–24.)

taken to the hospital for observation and adjustment of medication. (Tr. 48:24–50:4.) Kirshner

explained that there were no weapons at the house and that Kaplan was cooperative and not

dangerous. (Tr. 50:5–14.) The call was logged at 11:37 PM in the police officer's "background

event chronology," a computerized log of events from the evening of August 9, 2010, based on

radio runs and telephone calls. (*See* Pl. Ex. 21; Tr. 423:16–424:23.)

After Plaintiff finished her telephone calls, Jacobs left through the front door of the home,

and drove about a mile to his apartment. (Tr. 110:8–111:11.) Once he reached his driveway,

Jacobs and Kirshner spoke on the telephone.[5] (Tr. 111:9–13.) At or about the same time,

Kaplan returned to the couch where he had eaten dinner. (Tr. 296:20–24.) Approximately

fifteen minutes later, Kaplan heard and answered a knock on the door; it was Officer Curtain,

and Kaplan informed him that there was no problem and that Curtain could leave. (Tr. 115:7–

18, 296:23–299:6, 498:6–13.)

Kaplan walked with Curtain outside, and Plaintiff also came to the front door and walked

outside. (Tr. 115:19–116:9, 299:8–299:19, 499:1–4, 499:20–24.) Plaintiff and Curtain spoke

---

[5] Jacobs' and Kirshner's testimony differs as to this telephone call. Jacobs recalled receiving a call from Kirshner and returning to Plaintiff's home. (Tr. 11:9–23.) Kirshner recalled receiving a telephone call from Jacobs shortly after his conversation with the police dispatcher, in which Jacobs informed Kirshner that Plaintiff was in handcuffs. (*Compare* Tr. 111:9–13 *with* Tr. 50:16–52:9.) Kirshner did not mention an earlier telephone call *to* Jacobs.

Jacobs testified that he then returned to Plaintiff's home "to create an atmosphere or a condition where . . . [Plaintiff] and [Kaplan] would be safe from each other . . . [Plaintiff] would be safe from [Kaplan] and any continuing upset that might exist would be defused." (Tr: 112:3– 10.) Jacobs asked Kaplan to stay at his apartment for the evening, which offer Kaplan refused, and then offered his apartment to Plaintiff for the evening, which she refused. (Tr. 112:11– 113:15.) Jacobs then decided to sleep on the couch in the den "in the event that there was anything that might happen of concern between [Kaplan] and [Plaintiff]." (Tr. 113:11–115:3.) Kaplan did not recount this interaction with Jacobs during his testimony, and testified that Plaintiff had requested that Jacobs stay the night at their home. (Tr. 301:21–23.) Plaintiff recalled Jacobs trying to persuade her to leave, and her refusal, but noted that Jacobs and *Kaplan* determined that he would sleep on the couch in the den. (Tr. 497:17–19.)

outside of Kaplan's hearing, and Curtain told him to go into the house. (Tr. 299:20–300:14.) Plaintiff told Curtain that Kaplan had "mental problems" and that there had been "many domestic violence issues before," and told him to look it up on the "laptop thing in his car." (Tr. 500:5–21.)

Curtain then re-entered the home, holding Plaintiff by her hair, and said "don't tell me how to do my job, blondie."[6] (Tr. 116:10–14, 501:1–3.) Curtain directed Kaplan to go out to the back deck. (Tr. 317:7–21.) At this time, Plaintiff's Chihuahua was running around the floor and barking, and Curtain threatened to harm the dog if she was not quieted. (Tr. 120:12–24, 502:1–503:4.) Jacobs, who had returned to the home and was in the den, picked up the dog and handed it to Plaintiff, and then returned to the den couch. Curtain took the dog from Plaintiff's arms, asked where he could put the dog "to shut her up," and threw the dog into the bedroom, such that it made a "loud thud." (Tr. 122:18–125:13, 503:10–507:21.) Curtain continued to drag Plaintiff around the house by her ponytail, cursing at her, and dragged her into the den. (Tr. 508:10–510:21.)

Soon thereafter, Officer DiLena came into the house. (Tr. 127:24–128:6.) Curtain then grabbed Plaintiff by one arm and put a handcuff on her, cursing at her. (Tr. 135:3–6, 511:15–512:6.) DiLena and Curtain had a short conversation, and DiLena went out to the back deck where Kaplan sat smoking cigarettes. (Tr. 129:2–10, 132:10–21.) The deck had a window that looked into the den, and another that looked into the bedroom. (Tr. 130:2–131:18; Pl. Exs. 13, 14.) DiLena, and potentially Officer Lobello, who had arrived sometime after DiLena, spoke with Kaplan on the back porch; Lobello indicated that he had been to the house before for

---

[6] Kaplan testified that Plaintiff came into the house followed by all three Officers. (Tr. 30:17–19.)

previous calls about domestic disturbances, and both officers made lewd comments about Plaintiff. (Tr. 319:13–320:22, 513:4–6.) Curtain walked outside briefly and then came back inside to the den, and directed curse words and insults at Plaintiff. (Tr. 132:18–133:9, 513:1–10.) Curtain then informed Plaintiff that they intended to leave without doing anything with Kaplan, and Plaintiff protested that Kaplan needed his medication adjusted. (Tr. 134:6–135:1.)

Curtain "flipped" Plaintiff over so she was face down on the den couch and "jumped" on her back, injuring it. (Tr. 515:23–516:3.) Plaintiff pulled herself up onto the back of couch, which was up against the wall under the window, and started yelling for help to her husband on the back deck. (Tr. 135:18–136:13, 322:3–23.) At or about this time, or perhaps before he "flipped" Plaintiff, Curtain pulled Jacobs off the couch[7] and leaned Plaintiff up against the bottom portion of the couch such that her knees were on the floor, attempting to get the other handcuff onto Plaintiff's wrist, though her wrist may have slid out of it.[8] (Tr. 136:23–137:21, 519:18–520:2.) At that time, Lobello came inside. (Tr. 137:23–138:10.) The three officers briefly spoke, and Curtain returned to the den where Plaintiff was on the floor in one handcuff. (Tr. 139:3–22.) He put the second handcuff on Plaintiff, who complained it was too tight, and proceeded to lift Plaintiff up by the handcuffs, turn her around backward, and throw her toward DiLena, who was approximately six feet across the room from Curtain. (Tr. 140:4–12, 520:7–14.) Plaintiff was allowed to fall onto the concrete floor, which was covered only with "light"

---

[7] Plaintiff presented a photograph that showed a bruise on Jacobs' triceps, which Jacobs testified resulted from being pulled off of the couch. (Tr. 144:3–25; Pl. Ex. 12.)

[8] At or about this time, Kaplan testified that he witnessed Curtain using a "billy club" on Plaintiff. (Tr. 323:22–324:3.) Kaplan also testified that it was around this time he saw Curtain fling the Chihuahua across the room. (Tr. 325:4–10.) Curtain testified that he did carry a Monadnock expandable baton in his belt, but did not take it out of its sheath that evening. (Tr. 410:14–20.) Plaintiff testified that DiLena hit her with "that stick" on her thighs. (Tr. 523:11–16.)

carpet. (Tr. 140:12–16, 520:20–521:21.) This happened "at least 20 times back and forth" or "[a] minimum of 20" times. (Tr. 140:17–18, 521:22–24.) Plaintiff was screaming, and Kaplan, outside, pushed against the back door to try to get into the house, and was ordered by the Officers to remain outside.[9] (Tr. 323:1–18, 521:2–522:22.)

Jacobs was directed to leave the house, and he walked out through the front door and called 9-1-1 to request that a supervisor report to Plaintiff's home. (Tr. 140:23–141:25.) The background event chronology registered this event at 12:06 AM on August 10, 2010. (Pl. Ex. 21 at 1–2.) Jacobs then let himself back into the house, and saw that Curtain was smashing Plaintiff's head into the floor of the den. (Tr. 142:1–23.) Jacobs told the officers that a supervisor was on the way, at which point Lobello escorted Jacobs outside and stood with him on the porch. (Tr. 143:1–20.) Jacobs heard a scream from inside, and shortly thereafter an ambulance arrived. (Tr. 146:3–25.)

According to Plaintiff, Beneville the ambulance driver approached the door and saw her, saying "oh, my God, I think I need a gurney. She is so beaten and injured." (Tr. 526:23–24.) He went to go get a gurney, as he did not think Plaintiff should walk. (Tr. 527:5–6.) As Beneville turned to go, Curtain picked Plaintiff up by the ankles, raised her above his head, and "dunked" her head into a porcelain bowl that was on a table in the entry way, shattering the bowl and allowing Plaintiff to drop onto the ground. (Tr. 147:2–9, 174:24–175:15, 527:8–16.) The Officers escorted Plaintiff out the door, barefoot, and she asked for her shoes, her cell phone, and her purse, which were not given to her. (Tr. 147:10–25.) Plaintiff was loaded into the ambulance on a stretcher, where Lobello or Beneville asked for the handcuffs to be removed, a

---

[9] Jacobs testified that Kaplan picked up a plastic chair from the deck and hit it against the window. (Tr. 136:15–21.) Kaplan testified that he specifically contemplated and chose not to fling a chair at the window. (Tr. 372:14–20.)

request that Curtain refused.  (Tr. 528:18–530:8.)

Kaplan walked around the front of the house, where an officer informed him that Plaintiff was in the ambulance already.  (Tr. 328:8–21.)  Jacobs left Plaintiff's house and went to the First Precinct of the Nassau County Police Department.  (Tr. 150:16–151:9.)  Sometime that evening, at a time not made clear by the testimony, Jacobs also telephoned Kirshner and informed him that Plaintiff was in handcuffs and was apparently under arrest.[10]  (Tr. 50:16–52:9.)  Kirshner called 9-1-1 and explained to the dispatcher that something was "wrong" and that Kaplan just needed to have his medication adjusted.  (Tr.50:16–52:15.)  This telephone call was recorded at 12:10 AM on August 10, 2010.  (Pl. Ex. 21 at 2.)  Plaintiff was taken to the hospital at approximately 12:26 AM.  (*Id.*)

At the hospital, Curtain threatened Plaintiff and her family if she told anyone about what happened that evening, and ripped her necklace off of her neck.  (Tr. 532:3–17.)  Plaintiff was examined, and did not initially fully describe her complaints to the NUMC medical staff because she was afraid of the police, though she eventually told them that the police hurt her.  (Tr. 534:12–536:5.)

Approximately one hour after Plaintiff was taken to the hospital, she called Kaplan and ask that he get a car to come pick her up.  (Tr. 365:9–23.)  In the early hours of August 10, 2010, Kirshner received a call from hospital staff at the NUMC Psychiatric Unit, informing him that Plaintiff was about to be released.  (Tr. 52:16–54:3.)  Kirshner met Plaintiff at their mother's home, where he photographed Plaintiff's injuries.  (Tr. 54:7–24.)  Plaintiff had several bruises on her upper arms, forearms, wrists, legs and back, including a substantial dark bruise on her upper right arm, and Kirshner testified that there was swelling and "some fractures as well;" Plaintiff

---

[10]  Jacobs did not testify as to this telephone call.

testified that she was suffering from significant swelling in her hands, neck, legs, arms and shoulders, as well as black eyes, though those injuries are not apparent from the photographs in evidence.  (Tr. 54:15–63:17, 537:22–541:7, 649:6–654:4; *see also* Pl. Ex. 5A, 5B, 5X, 5XX, 5YY, 5ZZ and 5AAA; Def. Ex. R.)  Kirshner also observed blood that caused him to believe that Plaintiff had sustained a head injury.  (Tr. 75:6–76:2.)

Plaintiff and her witnesses testified that her physical health, affect and activities have changed since the incident.  (Tr. 64:15–68:14, 341:3–342:15, 557:4–566:9.)

### ii.   Defendants' version of events

On the evening of August 9, 2010, around approximately 11:30 PM, DiLena and Curtain were on vehicle patrol in separate vehicles when each received a call, over his radio, directing him to respond to a domestic disturbance at Plaintiff's address.  (Tr. 180:06–181:22, 382:4–383:10.)  DiLena and Curtain both responded to the call and arrived at the home at approximately the same time, in separate vehicles.  (Tr. 182:3–9, 183:10–16, 385:3–5.)  Plaintiff met DiLena and Curtain in front of her house, and although she appeared agitated, she spoke to them in a normal tone to explain that her husband was bipolar and needed to go to the hospital.[11] (Tr. 183:17–185:12, 389:13–17.)  DiLena and Curtain went inside through the front door, and Plaintiff followed.  (Tr. 185:13–10.)  DiLena spoke with Kaplan, and asked Kaplan to step outside onto the back deck.  (Tr. 187:1–23.)  Curtain remained inside with Plaintiff, who still appeared agitated and upset but was not incoherent.  (Tr. 191:17–24.)

Inside, Curtain heard Plaintiff's dog barking and asked Plaintiff to put the dog away

---

[11]  Curtain testified that the first person he encountered was Jacobs.  (Tr. 385:25–16.) Plaintiff was either outside with Jacobs or met Curtain at the front door when he encountered her.  (Tr. 388:4–12.)

because he did not want the barking to escalate the situation. (Tr. 394:7–15.) Curtain asked Jacobs to leave so he could interview Plaintiff, but Jacobs did not leave right away, instead walking out of and back into the house several times throughout the interview. (Tr. 395:24–397:6.) Curtain spoke with Plaintiff in the den, where she continued insisting to Curtain that Kaplan needed to go to the hospital, and refused to answer his questions about what had happened between them that required police intervention. (Tr. 397:7–19, 400:8–11, 454:9–455:3.) She became hysterical, and said she was going to kill herself.[12] (Tr. 403:21–404:4.) She was hostile, argumentative, uncooperative, belligerent and irrational, and began to yell at Curtain (Tr. 436:21–23, 444:1–445:3.)

On the back deck, Kaplan told DiLena that he found Plaintiff in bed with Jacobs. (Tr. 268:15–19.) DiLena continued asking questions, and "put together" the "story" that Kaplan found Plaintiff and Jacobs having sexual intercourse, demanded that Jacobs leave the house, and that Jacobs left. (Tr. 268:15–24.) After speaking with Kaplan for a period of time, DiLena heard Plaintiff yelling at Curtain inside. (Tr. 193:3–24, 268:25–269:2.) DiLena asked Kaplan to wait outside, and walked inside. He heard Plaintiff "rambling," berating Curtain, and yelling that she hated her husband, that she was going to kill herself, and that she wanted to die. (Tr. 196:2–9, 269:10–270:21.) According to DiLena, at that point he determined that Plaintiff was "going to be mental-aided," because he considered her a danger to herself or someone else, and handcuffed her — not without trouble, and with Curtain's assistance. (Tr. 197:12–198:20, 270:23–271:4, 401:10–25, 439:3–9.) Jacobs was not present at the time. (Tr. 198:21–23.)

At approximately 12:00 AM DiLena requested an ambulance for a "mental aided", and

_____

[12] Plaintiff testified that she did not threaten suicide and would not because it is "the most selfish thing in the world for anybody to do." (Tr. 523:23–524:11.)

then sat Plaintiff on the couch, where she threw herself onto the floor and started kicking at the officers. (Tr. 244:14–245:4, 271:5–21; Pl. Ex. 21 at 2; *see also* Tr. 739:17–740:1.) At about 12:07 AM, after Plaintiff was handcuffed, Lobello arrived on the scene. (Tr. 385:9–17, 712:1–713:10, 725:1–23.) Lobello observed Plaintiff falling onto the floor, yelling that she wanted to kill herself. (Tr. 713:11–714:8.) The Officers picked her up and sat her back on the couch, where she again threw herself onto the floor — they left her on the floor when she did the same thing a third time. (Tr. 246:5–22, 409:9–24.) At some point, Plaintiff's hand slipped out of one of the handcuffs. (Tr. 407:3–8.) While DiLena and Curtain were inside, Kaplan attempted to come inside through the back door, and either Curtain or DiLena told him to go back outside. (Tr. 408:3–14.) For a period of time, Lobello stood with Jacobs outside to keep him from "riling up" Plaintiff. (Tr.714:15–4715:4.)

Sometime thereafter, Jacobs re-entered the house and told the officers that he was an attorney and he could have them fired. (Tr. 272:15–19.) DiLena requested that a supervisor report to the scene. (Tr. 735:11–14.) At approximately 12:10 AM, the supervisor informed the officers that he was preoccupied with another assignment, and sent a message to Lobello asking Lobello to call him. (Tr. 272:22–273:6, 727:4–24, 735:11–18; *see also* Pl. Ex. 21 at 2.) Either Lobello or DiLena called the supervisor on his celluar telephone, and Lobello spoke with him. (Tr. 272:6–23, 728:1729:15.) The Officers and the supervisor determined that it would be wise to transport Plaintiff to the hospital as soon as possible. (Tr. 272:22–273:6, 735:11–18.) DiLena later recorded their determination that the supervisor disregard Jacob's request that a supervisor report to the scene into the computer, on the background event chronology. (Tr. 430:10–431:8; Pl. Ex. 21 at 2.)

After the ambulance arrived at approximately 12:09 AM, the Officers escorted Plaintiff

through the house and outside, by holding onto her arms. (Tr. 245:12–19, 273:7–19, 412:8–18; Pl. Ex. 21 at 1–2; *see also* Tr. 427:14–11..) Curtain noticed no bruising or marks on Plaintiff's arms or legs at that time. (Tr. 412:19–413:3.) On the way out the door, Plaintiff kicked a piece of furniture, breaking the bowl or vase that was sitting atop it. (Tr. 247:2–18, 272:17–19, 715:20–716:1.) She dropped to her knees four or five times on the grass outside, requiring that the Officers pick her back up, and attempted to kick the Officers multiple times. (Tr. 262:13–20, 716:2–4.) The EMS report signed by Beneville indicates that "upon arrival [Plaintiff was] found seated on floor handcuffed acting belligerently toward police," she made threats to hurt herself, was uncooperative and verbally abusive, and that Plaintiff was pulling and struggling as the Officers were walking her out of the house.[13] (Def. Ex. F.)

At approximately 12:26 AM, Curtain drove Plaintiff in the ambulance to NUMC. (Tr. 413:21–414:7, 429:16–19.) Lobello and Beneville rode in the ambulance as well. (Tr. 447:8–17, 718:5–17.) Lobello did not observe injuries on Plaintiff that evening. (Tr. 724:24–25.) They took her to triage and informed the hospital staff that Plaintiff was being irrational and belligerent, and while they did not write down that Plaintiff was threatening to kill herself, Curtain verbally informed the staff of her statements. (Tr. 414:11–25, 445:20–25; *see* Pl. Ex. 16 at Bates No. 164.)

### iii. NUMC records

At 12:35 AM on August 10, 2010, Plaintiff was admitted to the emergency department at

---

[13] Beneville himself had no independent recollection of the incident in question, and testified that reports like the one in question were typically based off of information provided by the police officers at the scene, witnesses and the patient, and his own observations. (Tr. 739:3–741:12, 742:20–744:4.) He did not specifically recall what information informed the report he prepared regarding the August 9, 2010 incident with Plaintiff, except his observation that Plaintiff was on the floor in handcuffs. (Tr. 748:22–750:22.)

NUMC, where the triage nurse noted that she was "acting irrational [*sic*]" and "threatened to hurt herself." (Pl. Ex. 16 at Bates No. 159.) According to the form, Plaintiff denied having thoughts of hurting herself or others. (*Id.*) An emergency physician saw Plaintiff at approximately 1:30 AM. (*Id.* at Bates No. 156.) His report indicates that Plaintiff's chief complaint was an "argument with husband about being loud," and that she had some bruises on her arm. A physical examination revealed "no acute distress" and that her head was "atraumatic," and the report only lists bruises on Plaintiff's arms. (*Id.* at Bates No. 157.) The report notes that the bruises were sustained when "the police tried to direct her and she resisted" and that she "was bruised while restrained." (*Id.*) Notes from a medical consultation similarly showed hematomas on Plaintiff's upper arms and scattered bruises on her lower arms, which Plaintiff reported were caused by police officers "holding her firmly in her arms" and "pinn[ing] her down." (*Id.* at Bates No. 162.)

At 2:26 AM, Plaintiff was cleared for discharge. (*Id.* at Bates No. 160.) Though multiple bruises were noted, Plaintiff refused CT scans or X-rays. (*Id.*)

### iv. The domestic incident report

DiLena completed a domestic incident report regarding the events of August 9, 2010, (Tr. 248:9–25; Pl. Ex. 3), and a case report, (Tr. 281:3–25; Def. Ex. A). The incident report form, which was filled out at the scene and meant to reflect the events of the evening, listed Kaplan as the complainant and Plaintiff as the subject of the report. (Tr. 250:15–7; Pl. Ex. 3 at 1.) DiLena testified that he filled out the form based on his interview with Kaplan earlier in the evening, and a statement Kaplan made to him. (Tr. 253:2–254:3, 256:2–8.) The form initially indicated that Plaintiff was not going to be removed from the scene to the hospital, which was later crossed out

and changed to indicate that she was.[14]  (Tr. 251:8–18; Pl. Ex. 3 at 1.)  The box that lists whether threats were made, include threats to "injure/kill persons" or "injure/kill self," is crossed out with a line through it — none of the individual boxes indicating threats were checked.  (Pl. Ex. 3 at 1.) The form also lists no "destroyed property" in the space provided.  (*Id.*)

In the "supporting deposition" on the second page of the report, Kaplan is again listed as the victim, and his signature is at the bottom of the page.  (*Id.* at 2.)  The form states Kaplan's belief that Plaintiff and Jacobs are in a relationship, and states that Kaplan believes Plaintiff "is a threat to herself, and me.  I believe my wife should go to the hospital for a psychiatric evaluation. I request no further police attention at this time." (*Id.*)  According to DiLena, he wrote the words on the page based on Kaplan's "dictat[ion]."  (Tr. 258:20–260:14, 274:17–275:1.)  DiLena testified that Kaplan was under no obligation to sign the form, and that Plaintiff was already on her way to the hospital at the time.  (Tr. 256:2–257:9.)  Kaplan testified that he was given the form after Plaintiff was in the ambulance, and told that he could either sign the form or Plaintiff would be arrested.  (Tr.329:24–332:7.)  Kaplan testified that he did not read the form, but he signed it.  (Tr. 332:1–7.)  While the document has two signatures reading "David Kaplan" on it, (*see* Pl. Ex. 3, at 2), Kaplan contends he only signed the document once and that the other signature is not his, (Tr. 332:8–21).  Kaplan testified that the narrative on the form is not an accurate description of the night's events.  (Tr. 33:11–336:12.)

### v.  Other evidence

Plaintiff suffers from multiple sclerosis ("MS"), Sjogren's syndrome, and osteoarthritis. (Tr. 476:1–24.)  She has taken a variety of medications for her ailments, but at the time of the

---

[14]  DiLena testified that this was merely an error in the paperwork, and that Plaintiff was already on her way to the hospital when he filled out the form.  (Tr. 251:8–23.)

incident was taking Copaxone, an injectable drug, which caused "welts" or bruising on her upper arms and legs, as well as her buttocks and stomach. (Tr. 70:15–71:8, 78:9–16, 477:5–14, 557:7–12; Pl. Ex. 16 at Bates No. 156.)

Within ten days of the August 9, 2010 incident, Plaintiff was granted an order of protection against Kaplan and Kaplan was removed from the house. (Tr. 160:4–7, 380:3–12.) Other orders of protection and reports were filed against Kaplan during their divorce. (Tr. 568:21–569:1.) Plaintiff has also sustained injury because of Kaplan's conduct on at least two occasions. Once, Kaplan and Plaintiff had an argument and Plaintiff threatened to call 9-1-1, and Kaplan ran into Plaintiff on the stairs, causing her to fall down the stairs. (Tr. 159:3–25.) On a different occasion, Kaplan was driving a car in which Plaintiff was a passenger when the two got into an argument. Kaplan grabbed Plaintiff to keep her from exiting the moving vehicle and he slammed on the brakes at a red light, causing Plaintiff's head to slam into the dashboard, breaking her nose. (Tr. 375:7–376:7, 473:14–475:11.)

## II. Discussion

### a. Standard of review

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, "[a] court may grant a new trial 'for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . .'" *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012) (quoting Fed. R. Civ. P. 59(a)(1)(A)). Grounds for granting a new trial may include verdicts that are against the weight of the evidence, *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003), substantial errors in the admission or rejection of evidence, *O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 166 (2d Cir. 2008), and non-harmless errors in jury instructions, *United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011), and verdict sheets,

*Armstrong ex rel Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 136 (2d Cir.

2005). A jury's verdict should "rarely be disturbed" and a motion for a new trial should be

granted only if the court is convinced that the jury's verdict is "seriously erroneous or a

miscarriage of justice." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002);

*Carroll v. Cty. of Monroe*, 712 F.3d 649, 653 (2d Cir. 2013); *Raedle*, 670 F.3d at 417–18; *see

also Armstrong*, 425 F.3d at 133 (reviewing Rule 50(b) motion).

### b. A new trial is not warranted

Plaintiff argues that she is entitled to a new trial because the jury's verdict was against the

weight of the evidence, resulting in a seriously erroneous decision and a miscarriage of justice.

(Pl. Mem. 6–10.) Plaintiff contends that Defendants presented false testimony and a false

domestic violence report, which improperly influenced the jury and led the jury to a seriously

erroneous result, warranting a new trial. (Pl. Mem. 9–10; Pl. Rely Mem. 6–10.) Plaintiff further

argues that juror confusion over whether to answer Question Seven on the verdict sheet warrants

a new trial. Defendants argue that a new trial is not necessary because the jury did not reach an

erroneous verdict and there was no miscarriage of justice.[15] (Def. Mem. 10–17.)

### i. Weight of the evidence

A motion for a new trial pursuant to Rule 59 on the ground that the verdict was against

---

[15] Defendant also argued that the motion was procedurally defective pursuant to Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, because Plaintiff initially failed to include a notice of motion and declaration to which her exhibits were attached. (Def. Mem. 2.) On February 11, 2015, Plaintiff sought leave of the Court to correct these defects, (Docket Entry No. 73), and the Court granted Plaintiff such leave on February 12, 2015. Although Plaintiff has not filed the Notice of Motion and Declaration as a separate docket entry, as directed in the Court's February 12, 2015 Order, Plaintiff's documents appear on the docket as attachments to her February 11, 2015 letter. As Plaintiff has substantially complied with the rule, the Court declines to decide the motion on these procedural grounds.

the weight of the evidence is committed to the discretion of the trial judge.  In considering such a motion, the trial judge is free to weigh the evidence herself, and may grant the motion even if there is substantial evidence supporting the jury's verdict.  *Manley*, 337 F.3d at 244; *Medina v. Donaldson*, No. 10-CV-5922, 2014 WL 1010951, at \*14 (E.D.N.Y. Mar. 14, 2014); *see also Leo v. Long Island R. Co.*, --- F. Supp. 3d ---, 2015 WL 1958906, at \*6 (S.D.N.Y. Apr. 30, 2015) ("In assessing such a motion, the court may weigh the evidence, including witness credibility, 'and need not view the evidence in the light most favorable to the verdict winner.'" (quoting *Raedel,* 670 F.3d at 418)).  However, where the resolution of the issues at trial depended largely on the jury's assessments of witness credibility, trial judges must exercise their discretion and ability to weigh the evidence "with caution and great restraint," and only rarely disturb the jury's verdict.  *Raedle*, 670 F.3d at 418; *DePascale v. Sylvania Elec. Prods., Inc.*, 510 F. App'x 77, 79 (2d Cir. 2013) ("Where resolution of the issues at trial depends on an assessment of the credibility of witnesses, district courts should be particularly cognizant of the danger of usurping the jury's function."); *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 134 (2d Cir. 1986) ("It has long been settled that '[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.'" (alteration in original) (quoting *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35 (1944))).  A court may not grant a new trial simply because the judge disagrees with the jury.  *Raedle*, 670 F.3d at 418; *United States v. Landau*, 155 F.3d 93, 104–05 (2d Cir. 1998).

Plaintiff relies heavily on *Ruffin v. Fuller*, 125 F. Supp. 2d 105 (S.D.N.Y. 2000), a prisoner's civil rights suit, to argue that the verdict in this trial was against the weight of the evidence.  In *Ruffin*, the Court *sua sponte* ordered a new trial after the jury returned a verdict that

the defendant had not violated plaintiff's Eighth Amendment rights by kicking the plaintiff in the mouth and breaking some of his teeth. The plaintiff contended that the defendants beat him and kicked him in the teeth, causing his injuries. The defendants proffered the theory that the plaintiff broke his own teeth on his bed or on a radiator, a theory which was not consistent with the medical testimony. Judge Chin expressed his firm conviction that the plaintiff's injury had been caused by a kick in the mouth, citing video, medical, and eyewitness testimony, as well as substantial evidence which caused him to question the truthfulness of the corrections officers' testimony. *Id.* at 109.

The Court has no such conviction here. The evidence presented at trial shows that Plaintiff sustained multiple hematomas, *i.e.* bruises, on her arms and perhaps on other parts of her body. Her documented physical injuries could have been consistent with either version of events as presented, and whether she sustained additional injuries (including psychological injury) and the source of those injuries depended almost entirely on the jury's evaluation of each witness's credibility. Plaintiff questions the Officers' credibility by highlighting that none of the Officers specifically accounted for — or even could recall observing — Plaintiff's injuries on the night of August 9, 2010, which were documented in hospital records and photographs. However, Plaintiff's witnesses each had their own credibility issues, including the inconsistencies about which officers arrived when, who allegedly beat Plaintiff with a baton, (*see* Tr. 323:22–324:3, 523:11–16), or even neutral facts like what Plaintiff was wearing or whether Kaplan picked up a plastic chair from the back deck and threw it at the window. *See Ruffin*, 125 F. Supp. 2d at 109. As much as Defendants' witnesses may have presented varied or inconsistent testimony, (*see* Pl. Mem. 9–10), Plaintiff's witnesses did as well. It is not the Court's place to second-guess the jury's apparent decisions to accept or reject certain testimony. *See Brink v. Muscente*, No. 11-

CV-4306, 2014 WL 4810329, at *5 (S.D.N.Y. Sept. 23, 2014) ("Because the jury was entitled to believe or *disbelieve* the [plaintiff's] testimony, the jury was free to reject the [plaintiff's] testimony and find, as it evidently did, that [the plaintiff] failed to carry her burden."). While the record is not as clear as either party asserts it is, the Court is reluctant to disturb the jury's verdict in this case, where resolution of the factual disputes depends substantially on credibility assessments. *See ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014) ("[W]hen, as here, a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice. This case is not such a case." (internal quotation marks and citation omitted)).

As to Plaintiff's allegations of false testimony, (*see* Pl. Mem. 9–10), at best her argument is simply a challenge to the jury's decision to credit the Officers' version of events despite their incongruities. Plaintiff points to nothing beyond the evidence that was presented to the jury at trial to support her claim. "This is not a case where contradictory evidence subsequently comes to light revealing a perjury that would warrant a new trial. All of the conflicting versions, if they were conflicting, were before the jury." *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 875 (2d Cir. 1992) (finding that the district court abused its discretion in granting a new trial). Affording the properly high degree of deference to the jury's evaluation of witness credibility, after reviewing the evidence, the Court lacks the firm conviction that there were seriously erroneous or egregious errors in the jury's conclusion, nor does it see a miscarriage of justice.

### ii. Juror confusion

Plaintiff further contends that the jury was confused, as illustrated by the jury's failure to follow the Court's instructions on the verdict sheet and stop deliberations once they answered

"no" as to all individual Defendants for questions one through six, instead continuing to question

seven, pertaining to the liability of Nassau County. (Pl. Mem. 10–11.) Plaintiff argues that the

jury disregarded its duty to deliberate and weigh the evidence, and that permitting the jury

verdict to stand would result in a miscarriage of justice.[16] (Pl. Reply Mem. 5–6.)

Question Seven of the verdict sheet directed the jury, if they had found any of the

individual Defendants liable for Plaintiff's state law tort claims, to analyze whether the

Defendant was acting in the scope of his employment. Although the jury found no liability as to

the individual Defendants, the jury first requested clarification on Question Seven, and then —

less than twenty minutes later, without waiting for clarification — the jury submitted a note

indicating that they had reached a verdict. (*See* Ct. Exs. 3–4.) The jury ultimately answered

question seven in the negative, despite the instruction that their deliberations were complete if

they did not find the individual Defendants liable as to the specified causes of action. (Tr.

932:10–933:2.)

While the jury may have shown confusion as to whether they were supposed to answer

question seven, there is no indication that the jury gave this case anything other than full and

conscientious consideration. It is unclear whether the jury "flippantly" disregarded the Court's

instructions, as Plaintiff suggests, or, as a result of a failure to read carefully or an attempt to be

thorough, simply specified its verdict as to the County of Nassau *in addition* to illustrating its

---

[16] Plaintiff does not appear to argue that the substance or form of the verdict sheet
resulted in juror confusion, as Defendants suggest. Plaintiff rather argues that Defendants'
alleged false testimony and false evidence improperly influenced the jury, which resulted in
confusion *as evidenced by* their inability to follow instructions on the verdict sheet. (Pl. Mem.
10–11.) Plaintiff specifically states that she has "not proffered any challenge to the verdict sheet
or the Court's instruction." (Pl. Reply Mem. 4.) Thus, while Defendant correctly asserts that
Plaintiff failed to preserve any objection to the form or substance of the questions on the verdict
sheet, *see Smith v. Ligthning Bolt Prods., Inc.*, 861 F.2d 363, 370–71 (2d Cir. 1988), the Court
does not understand Plaintiff to be attempting to raise such an objection in her Rule 59 motion.

verdict as to the individual Defendants.  Regardless, the jury's intent as to liability was clear, and the verdict sheet is not inconsistent and presents no evidence of confusion as to the law the jurors were expected to apply.[17]  *See Green v. Groneman*, 634 F. Supp. 2d 274, 277–78 (E.D.N.Y. 2009) (denying motion for new trial on grounds of juror confusion when jury submitted no questions conveying confusion, and nothing indicated that the verdict was inconsistent or indicative of juror confusion); *Bakalor v. J.B. Hunt Transport, Inc.*, No. 11-CV-2911, 2013 WL 3185546 (S.D.N.Y. June 24, 2013) (finding no "irreconcilable inconsistency" in jury verdict that would warrant new trial).  Additionally, it was appropriate for the Court to take the jury's verdict before providing the jury with the requested clarification, as the jury indicated that it had reached a verdict without any clarification.  *See Celebrity Cruises Inc. v. Essef Corp.*, 478 F. Supp. 2d 440, 455 (S.D.N.Y. 2007) (citing *United States v. Young*, 140 F.3d 453, 456-57 (2d Cir.1998)); *see also Green*, 634 F. Supp. 2d at 276–77 (denying motion for new trial on grounds of juror confusion when jury reached a verdict a mere ten minutes after they had requested a copy of the jury instructions, before the court could provide them with a copy).  Nothing about the manner in which the jury delivered its verdict or completed the verdict sheet suggests that the jury's verdict was "egregious," nor does it change the Court's analysis as to the weight of the evidence in this

---

[17]  Furthermore, there is no indication that answering Question Seven affected the jury's decision as to liability on Plaintiff's other claims and, to the extent the jury found no liability on Plaintiff's other claims, Nassau County would not have been liable to Plaintiff either.  Thus, the Court cannot conclude that the jurors were misinformed or misunderstood a critical part of their duty such that it would undermine the validity of the verdict.  *Cf. Amstrong ex rel Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 136 (2d Cir. 2005) (reviewing verdict sheet for fundamental error when objection not raised at trial; granting motion for new trial when a fundamental error in the verdict sheet misinformed jurors as to the legal requirements for liability, thus undermining the integrity of the trial).

action.[18]  Ultimately, the Court is not convinced that the jury's error in completing the verdict sheet is evidence of a miscarriage of justice or a manifestly erroneous verdict.

### III.  Conclusion

For the foregoing reasons, the Court denies Plaintiff's motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: August 4, 2015
        Brooklyn, New York

---

[18]  Plaintiff argues that the "false testimony" of Defendants "confused" the jurors, conflating the two arguments discussed separately above.  For substantially the same reasons the Court has rejected both arguments individually, the Court rejects this hybrid argument as well.